**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**DAVID PRICE,** *as a candidate for the*
*position for Albany County Republican*
*Committeeman from the 14th Ward, 6th*
*District, City of Albany,* **THE ALBANY**
**COUNTY REPUBLICAN COMMITTEE,**
**MARTHA McMAHON and JAMES**
**THORNTON,** *Absentee Voters,*

                       **Plaintiffs,**              **No. 06-cv-1083**
                                              **(GLS/RFT)**

              **v.**

**THE NEW YORK STATE BOARD OF**
**ELECTIONS, NEIL W. KELLEHER,** *in*
*his official capacity as a Commissioner*
*of the New York State Board of Elections,*
**DOUGLAS A. KELLNER,** *in his official*
*capacity as a Commissioner of the New*
*York State Board of Elections,* **EVELYN**
**J. AQUILA,** *in her official capacity as a*
*Commissioner of the New York State*
*Board of Elections,* **HELENA MOSES**
**DONOHUE,** *in her official capacity as a*
*Commissioner of the New York State*
*Board of Elections,*

                         **Defendants.**

---

**APPEARANCES:**

**FOR THE PLAINTIFFS:**

Office of Thomas Marcelle         THOMAS MARCELLE, ESQ.
2 E-Comm Square,
3rd Floor

Albany, NY 12207

**FOR THE DEFENDANTS:**

New York State Board of Elections            TODD VALENTINE, ESQ.
Office of Special Counsel
40 Steuben Street
Albany, NY 12207-1650

**Gary L. Sharpe**
**U.S. District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

David Price, the Albany County Republican Committee, Martha McMahon, and James Thornton (collectively, the "Republican Party") bring this civil rights action pursuant to 42 U.S.C. §§ 1983 and 1988 for deprivations of their rights secured by the First and Fourteenth Amendments to the Constitution.  Pending before the court is the Republican Party's motion for summary judgment (*Dkt. 22*) and the New York State Board of Elections' cross-motion to dismiss (*Dkt. 24*).  For the reasons set forth below, the Republican Party's motion for summary judgment is denied, and the New York State Board of Elections' cross-motion to dismiss is granted.  New York Election Law § 7-122 does not

burden a fundamental right, and it is rationally related to a legitimate government interest.

## II. **Jurisdiction**

The Republican Party invokes the court's jurisdiction pursuant to 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4), which provide for original jurisdiction over all suits brought pursuant to 42 U.S.C. § 1983.  Jurisdiction is also conferred on the court by 28 U.S.C. § 1331 because the cause of action arises under the Constitution and laws of the United States.

Although neither party has raised the prospect of mootness,[1] the court notes that this case is not moot, because the Republican Party has requested nominal damages.  *See Van Wie v. Pataki,* 267 F.3d 109, 115 n. 4 (2d Cir. 2001) (noting that "plaintiffs in election cases [can] avoid the potential for mootness by simply expressly pleading that should the election pass before the issuance of injunctive relief, nominal money damages are requested").

## III. **Procedural History**

---

[1]Mootness is a jurisdictional issue which may be addressed by the court *sua sponte. See, e.g., United States v. Suleiman,* 208 F.3d 32, 36 (2d Cir. 2000).

3

On September 8, 2006, the Republican Party filed its original complaint against the Albany County Board of Elections ("County Board") and the New York State Board of Elections ("State Board").  *Dkt. 1.*  The same day, the Republican Party filed an emergency motion for a temporary restraining order ("TRO").  They asked the court to order the County Board to immediately distribute to all eligible Republican Primary absentee voters an absentee ballot that contained a provision for casting a ballot for the party position of Albany County Committeeman in the 14th Ward 6th District ("14-6 Committeeman").  *See Dkt. 3.*  The Republican Party's need for emergency relief was premised on the fact that the Republican Primary was scheduled for September 12, 2006, four days away.

At a hearing on September 11, 2006, the day before the Republican Primary, the court heard arguments from counsel for the parties and granted the TRO.  *See Transcript of Proceedings; Dkt. 19.*  The order, signed by the court on September 11, 2006, directed the County Board to make available to individual plaintiffs McMahon and Thornton a supplemental paper ballot containing a provision for voting for the party position of 14-6 Committeeman.  *Dkt. 6.*  The County Board was further directed not to tally, canvass, or cast the supplemental ballots unless and

until ordered to do so by the court, and not to certify a winner of the election for the party position of 14-6 Committeeman unless and until ordered by the court. *Id.*

Following the election, on September 28, 2006, the Republican Party filed an amended complaint, which added State Board Commissioners Neil Kelleher, Douglas Kellner, Evelyn Aquila, and Helena Moses Donohue (collectively, the "Commissioners") as defendants. *Dkt. 9.* By stipulation and order dated October 2, 2006, all claims against the County Board were dismissed subject to the County Board's agreement to abide by any and all subsequent orders of the court with respect to the tallying, canvassing, and/or casting of the absentee ballots of individual plaintiffs McMahon and Thornton. *See Dkt. 11.* The State Board and the Commissioners filed their respective answers to the amended complaint on October 18, 2006. *Dkt. 12, 13.*

By letter dated May 4, 2007, counsel for the Republican Party informed the court that the parties, being in agreement that the case involved solely a question of law, planned to make cross motions for summary judgment. *See Dkt. 20.* On July 13, 2007, the Republican Party filed its motion for summary judgment. *Dkt. 22.* On July 30, the State

Board filed its cross motion to dismiss.[2]  *Dkt. 24.*  The Republican Party

filed its reply to the cross motion to dismiss on September 13, 2007.  *Dkt.*

*29.*  The court heard oral argument on October 4, 2007.

## IV.  Facts

The facts of this case are largely undisputed.  Thus, the court

touches only briefly on the particulars of the Republican Primary of 2006,

and focuses most of its attention more broadly on the laws that govern

primaries, including New York Election Law § 7-122, which the Republican

Party claims is unconstitutional.

### 1.    The Republican Primary, in General

Pursuant to the rules of the Albany County Republican Committee

(the "Republican Committee") and New York State Election Law, the

Republican Committee is composed of two representatives from each of

the 349 election districts in Albany County.  *See Decl. of Peter Kermani in*

*Supp. of Pls.' Mot. for Summ. J. ("Kermani Decl.") ¶¶ 3, 5; Dkt. 22.*  These

representatives (the "Committeemen") are elected biannually in even

number years (*e.g.*, elections in 2004, 2006, etc.), and their term of office

---

[2]The motion by the State Board is couched as a motion to dismiss, in contrast to the
Republican Party's motion, which is a motion for summary judgment.

begins the day after the Republican Primary at which they are elected.  *Id.*

*at ¶¶ 7,8.*[3]

In order for a candidate's name to appear on the ballot for a

Committeeman position, the candidate must circulate a designating

petition.  *Id. at ¶ 10.*  In the event that only one candidate has submitted a

valid designating petition for a given seat on the Republican Committee,

then no election is necessary.[4]  The Republican Party asserts that

contested elections for Committeeman positions are relatively rare;

generally, only three or four seats are contested during an election cycle.

*See Pls.' Statement of Material Facts ("Pls.' S.M.F.") ¶¶ 9, 10; Dkt. 22.*[5]

## 2.    The 2006 Republican Primary

As it happened, the position of 14-6 Committeeman was contested at

the Republican Primary on September 12, 2006.  In addition to individual

plaintiff David Price, Joseph Sullivan and Anthony Gray also filed

---

[3]For clarity's sake, it is worth noting that although Committeemen are elected at what is termed a "primary" election–which is the stage at which party members vote on the nominees for state- or county-wide positions–the Committeemen are actually elected to office at these elections.

[4]The parties do not elaborate on the procedures governing uncontested elections.  It is implied from the parties' submissions that if you are the only candidate for a spot, then you automatically win.  How this is reflected in the election records is not discussed, and is, in any event, not relevant to this case.

[5]The State Board has not conceded this point.  *See Defs.' Resp. to Pls.' S.M.F., ¶¶ 8, 9; Dkt. 26.*

designating petitions for the position of 14-6 Committeeman.  *See Kermani Decl. ¶ 12; Dkt. 22.*  Thus, there were three candidates for two positions. The two open positions were to be voted on by the approximately 27 enrolled Republicans residing in the 14th Ward 6th District of Albany County. *Id. at ¶ 21.*

Individual plaintiffs Martha McMahon and James Thornton reside in the 14th Ward 6th District, and were, at the time the original complaint was filed, eligible to vote for the position of 14-6 Committeeman.  However, they planned to be out of Albany County on election day, and thus both submitted applications to vote by absentee ballot.  McMahon and Thornton submit that they applied for absentee ballots mainly because of their interest in voting for the position of 14-6 Committeeman.  *See Pls.' S.M.F. ¶ 19; Dkt. 22.*  The County Board approved the applications, and sent McMahon and Thornton absentee ballots for the Republican Primary.  In accordance with the mandate of New York Election Law § 7-122, the absentee ballots did not include provisions for casting a ballot for the position of 14-6 Committeeman.  *Id. at ¶ 22.*

On September 12, 2006, the County Board determined the unofficial results of the election for the party position of 14-6 Committeeman to be:

8

David Price:      10
Joseph Sullivan: 7
Anthony Gray:    7

*Id. at* ¶ *27.*  These results do not include the votes of McMahon and

Thornton, which remain sealed.  *Id. at* ¶¶ *29, 30.*

### 3.     **Election Law** § **7-122**

As stated above, the absentee ballots that were provided to

McMahon and Thornton did not include provisions for casting a ballot for

the party position of 14-6 Committeeman.  This is in accordance with New

York Election Law § 7-122, which provides, in relevant part:

> Ballots for absentee voters shall be, as nearly as practicable, in
> the same form as those to be voted in the district on election
> day, if any, except that ballots for primary elections <u>shall omit</u>
> the party position of ward, town, city or county committee . . . .

N.Y. ELEC. LAW § 7-122(1)(a) (emphasis added).[6]  The parties agree that

the absentee ballots provided to McMahon and Thornton complied with

applicable law.  At issue is the constitutionality of said law.

-------------------

[6]Election Law § 7-122 does not prohibit voting by absentee ballot for the party position of *state* committee member.  The Republican Party argues that this renders the statute underinclusive, which, in turn, indicates that it is not "narrowly tailored" to achieve a legitimate government purpose.  However, as discussed below, the "narrowly tailored" standard, which is a component of strict scrutiny, is not appropriate in this case–rather, only rational basis review applies.  Thus, the potential underinclusiveness of § 7-122 is ultimately of no moment.

## V.  Discussion

### A.     Standard of Review

Pending before the court is the Republican Party's motion for
summary judgment and the State Board's cross motion to dismiss.  The
standards of review applicable to these motions differ.  The court
addresses each standard in turn.

### 1.     Motion for Summary Judgment

Summary judgment shall be granted "if the pleadings, depositions,
answers to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any material fact
and that the moving party is entitled to a judgment as a matter of law."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (citing FED. R.
CIV. P. 56(c)); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d
165,170 (2d Cir. 2006) (citation omitted).  All reasonable inferences must
be drawn in favor of the nonmoving party.  *See Allen v. Coughlin,* 64 F.3d
77, 79 (2d Cir.1995).  The moving party "bears the initial responsibility of
informing the district court of the basis for its motion, and identifying those

portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation omitted); *see also SEC. v. Kern*, 425 F.3d 143, 147 (2d Cir. 2005). "A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988) (citation omitted). However, "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

### 2.    Motion to Dismiss

Rule 12(b)(6) provides that a cause of action shall be dismissed if a complaint fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Thus, "[t]o survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v.*

11

*Twombly,* 127 S.Ct. 1955, 1965 (2007)).[7]  "A court's task in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."  *AmBase Corp. v. City Investing Co. Liquidating Trust*, 326 F.3d 63, 72 (2d Cir. 2003) (internal quotation marks and citation omitted). Therefore, in reviewing a motion to dismiss, a court "must accept the facts alleged in the complaint as true and construe all reasonable inferences in [the plaintiff's] favor."  *Fowlkes v. Adamec*, 432 F.3d 90, 95 (2d Cir. 2005) (citation omitted).

## B.    Constitutional Claims

---

[7]In *Twombly,* the Supreme Court rejected its own long-standing rule that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  127 S. Ct. at 1968-1970 (rejecting the standard set forth in *Conley v. Gibson,* 355 U.S. 41 (1957)).  The Court wrote that "after puzzling the profession for 50 years, this famous observation has earned its retirement."  *Id.* at 1969.  The problem with the *Conley* standard, in the Court's eyes, is that, on a literal reading of the "no set of facts" language, "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery."  *Id.* at 1968 (alteration in original).

This court has recently stated that a cause of action should be dismissed pursuant to Rule 12(b)(6) "if it appears beyond doubt that the plaintiff can prove no set of facts in support of the complaint which would entitle him to relief."  *Jones v. DaimlerChrysler Corp.,* No. 05-cv-1006, 2007 WL 2454209, *1 (N.D.N.Y. Aug. 23, 2007).  This positive statement of the standard for dismissal (*i.e.,* "should be dismissed . . . if" as opposed to the negative statement "should not be dismissed . . . unless") undoubtedly still remains valid.  In other words, if a plaintiff can prove no set of facts in support of his claim which would entitle him to relief, then surely his complaint must be dismissed.  The Supreme Court's point is that even where some set of speculative facts exists under which the plaintiff would be entitled to relief, dismissal may still be appropriate.  Hence, the standard stated by the Second Circuit in *ATSI, supra.*

## 1.    Summary of Claims

The Republican Party claims that New York Election Law § 7-122 unconstitutionally restricts its rights secured by the First and Fourteenth Amendments to the United States Constitution.  *See Pls.' Mem. of Law, p. 4; Dkt. 23.*  It claims that its constitutional rights are violated in several different respects.

First, the Republican Party claims that Election Law § 7-122 violates the equal protection rights of individual plaintiffs McMahon and Thornton.[8] For purposes of its equal protection analysis, the Republican Party points to two classes of voters who, it alleges, are treated disparately.  The first class of voters is the class that votes by absentee ballot.  A voter in this class, the Republican Party argues, is "not given the opportunity to vote for County Committeeman pursuant to Election Law § 7-122," and thereby "loses his franchise and ability to elect a county party representative."  *See Pls.' Mem. of Law, p. 7; Dkt. 23.*  The second class of voters is the class of

---

[8]The Complaint alleges that David Price and the Republican Committee have also suffered violations of their right to equal protection of the law.  However, the Republican Party's brief addresses itself only to the equal protection violations that McMahon and Thornton are alleged to have suffered.  The court concludes that to the extent that Price and the Republican Committee are claiming violations of their rights to equal protection as well, such claims are derivative of the deprivations alleged to have been suffered by the absentee voters, McMahon and Thornton.  Thus, the court's discussion of the absentee voters' equal protection claims applies as well to any equal protection claims asserted by Price and the Republican Committee.

paper voters who show up at the polls to vote but who, for some reason (*e.g.*, a challenge ballot, an emergency ballot, a provisional ballot, or handicapped ballot), must vote on paper.  *Id. at p. 8.*[9]  The voters in this second class are permitted to vote on a paper ballot that is substantially the same ballot as the absentee ballot, with the exception that the paper ballots available at the polls contain a provision to vote for Committeeman.  According to the Republican Party, this disparate treatment violates the absentee voters' equal protection rights.

Second, the Republican Party claims that Election Law § 7-122 violates Price's First Amendment right to ballot access.  *See Pls.' Mem. of Law, p. 6; Dkt. 23.*

Finally, the Republican Party claims that Election Law § 7-122 violates the Republican Committee's First Amendment right to associate with absentee voters.  *See Pls.' Mem. of Law, p. 6; Dkt. 23.*

### 2.    Standard of Review

A court considering a constitutional challenge to a state election law "must weigh the character and magnitude of the asserted injury to the

---

[9]Neither party refers to the section of the New York Election Law that authorizes such paper ballots.  However, the parties do not appear to dispute the fact that such paper balloting does occur in the special circumstances cited by the Republican Party.

rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick v. Takushi,* 504 U.S. 428, 434 (1992) (internal quotations and citations omitted).  Courts apply a sliding scale, under which "the rigorousness of [the] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id.*  Thus, "[w]hen state election laws subject speech, association, or the right to vote to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." *Lerman v. Bd. of Elections in the City of New York,* 232 F.3d 135, 145 (2d Cir. 2000) (internal quotations and citations omitted).  By contrast, "when a state election law imposes only reasonable, nondiscriminatory restrictions upon First and Fourteenth Amendment rights, then the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (internal quotations and citations omitted).

    **3.**    **The Extent of the Burden**

As stated, the first step in the constitutional analysis is to determine

"the extent to which a challenged regulation burdens First and Fourteenth

Amendment rights."  *Burdick,* 504 U.S. at 434.  The extent of the burden

informs the rigorousness of the court's inquiry into the propriety of the law.

*Id.*

The Republican Party argues that the court should apply strict

scrutiny to its assessment of New York Election Law § 7-122, because the

law imposes a severe burden on the fundamental right to vote, without

being narrowly drawn to advance a state interest of compelling importance.

*See Pls.' Mem. of Law, p. 5; Dkt. 23.*  The State Board, by contrast, argues

that the burden on voting rights is minimal, that heightened scrutiny is not

required, and that Election Law § 7-122 passes muster under a rational

basis analysis.  *See Defs.' Mem. of Law, p. 4; Dkt. 24.*

a.    Equal Protection Claim–Nature of the Burden

Addressing first the equal protection claim, the Republican Party

takes it as a given that Election Law § 7-122 burdens voters' ability to vote

for County Committeemen.  It argues that "the question is not whether § 7-

122 burdens voting, but rather is whether or not voting is a fundamental

right."  *See Pls.' Mem. of Law, p. 8; Dkt. 23.*  Voting is, of course, a

16

fundamental right.  *See, e.g., Anderson v. Celebrezze,* 460 U.S. 780, 787

(1983) (noting that it "rank[s] among our most precious freedoms") (citation

omitted).  Thus, the Republican Party argues, Election Law § 7-122,

burdening as it does a fundamental right, must be narrowly tailored to

serve a substantial state interest.

In reaching this conclusion, however, the Republican Party has

glossed over the most important question: whether Election Law § 7-122

burdens voters' ability to vote for County Committeemen.  The Republican

Party assumes that the statute burdens voting.  However, a closer look at

the relevant case law reveals that, absent special circumstances not

present here, a restriction on absentee balloting does not constitute a

burden on the fundamental right to vote.

In *McDonald v. Board of Election Commissioners of Chicago,* 394

U.S. 802 (1969), the Supreme Court addressed the constitutionality of an

Illinois absentee balloting statute which made no provision for balloting by

unsentenced inmates awaiting trial while imprisoned in the county of their

residence.  The absentee balloting statute at issue made absentee ballots

available to, among other classes, those who were absent from the county

of their residence for any reason whatever, and those who were "physically

incapacitated" for medical reasons.  The inmate plaintiffs argued that the absentee ballot provisions violated the Equal Protection Clause for two reasons.  First, they took issue with the provision in the law that permitted absentee voting by those who were physically incapacitated for medical reasons.  They argued that there was no reasonable justification for making a distinction between the medically incapacitated and the "judicially" incapacitated.  Second, they argued that since pretrial detainees imprisoned in counties other than the county of their residence were entitled to an absentee ballot, it was arbitrary and unfair to deny absentee ballots to those inmates who happened to be imprisoned in their county of residence.

The Supreme Court determined that the Illinois statutory scheme was subject only to rational basis review, not strict scrutiny.  *Id.* at 807-809.  The Court reasoned that there was nothing in the record to indicate that the Illinois statute had any impact on the inmates' ability to exercise the fundamental right to vote.  *Id.* at 807.  The Court wrote that "[d]espite [the inmates'] claim to the contrary, the absentee statutes, which are designed to make voting more available to some groups who cannot easily get to the polls, do not themselves deny appellants the exercise of the franchise."  *Id.*

at 807-808.  Thus, the statute impacted only a "claimed right to receive absentee ballots," not the "fundamental right to vote."  *Id.* at 807.

The Republican Party's reliance on *O'Brien v. Skinner,* 414 U.S. 524 (1974) is misplaced.  In that case, the Supreme Court invalidated, on equal protection grounds, a statutory scheme quite similar to that at issue in *McDonald.*  The Court was troubled by the prospect that "two citizens awaiting trial . . . sitting side by side in the same cell, may receive different treatment as to voting rights."  *O'Brien,* 414 U.S. at 529.

At first glance, *O'Brien* appears to be in direct conflict with the Court's earlier holding in *McDonald.*  However, upon a closer reading, the two cases are easily reconciled.  The Court explained in *O'Brien* that "[u]nlike the present case . . . in *McDonald* there was nothing in the record to show that appellants were in fact *absolutely prohibited* from voting by the State."  *O'Brien,* 414 U.S. at 529 (emphasis added) (internal quotations and citation omitted).  The *McDonald* Court had suggested, for instance, that the State of Illinois might provide inmates with alternative methods of voting, such as furnishing the jails with special polling booths.  *McDonald,* 394 U.S. at 809, n 6.  In *O'Brien,* by contrast, the New York Court of Appeals had previously construed the New York absentee ballot statute at issue in that case as

prohibiting the plaintiff inmates from voting in any manner whatsoever.  *See O'Brien,* 414 U.S. at 532-533 (Marshall, J., concurring).  Thus, the Court found that it had "no choice, therefore, but to hold that, *as construed* [by the New York Court of Appeals], the New York statutes deny appellants the equal protection of the laws."  *Id.* at 531 (emphasis added).

The lesson of *O'Brien* and *McDonald* is that restrictions on access to absentee ballots do not severely burden the right to vote, so long as the class of voters to whom absentee ballots are denied are not thereby deprived of their only method of voting.[10]  This is true even when the denial of an absentee ballot renders voting "extremely difficult, if not practically impossible."  *McDonald,* 394 U.S. at 810.

In the current case, of course, the plaintiff-voters McMahon and Thornton were not denied absentee ballots; instead, they were provided

---

[10]This reading of *McDonald* is supported by the Supreme Court's later decision in *Kramer v. Union Free School District,* 395 U.S. 621 (1969).  In that case, the Court applied strict scrutiny to a New York election law that provided that a resident could only vote in school board elections if he owned or leased property in the district, or had a child who attended a local public school.  The court distinguished the rational-basis review of *McDonald,* writing:

> The present appeal involves an absolute denial of the franchise.  In *McDonald*, on the other hand, we were reviewing a statute which made casting a ballot easier for some who were unable to come to the polls.  As we noted, there was no evidence that the statute absolutely prohibited anyone from exercising the franchise; at issue was not a claimed right to vote but a claimed right to an absentee ballot.

*Id.* at 627, n. 6.  The key inquiry, then, is whether the statute "absolutely prohibits" the exercise of the franchise.

with absentee ballots that did not include a provision for voting for a particular office.  In spite of this slight difference in facts, the holdings of *McDonald* and *O'Brien* remain applicable.  McMahon and Thornton were not denied their fundamental right to vote.  Rather, they were not provided with a method of voting–*i.e.*, absentee balloting–that would have made voting more convenient.  In such circumstances, the burden on the fundamental right to vote is, at best, *de minimis*.

b.    <u>The Ballot Access Claim–Nature of the Burden</u>

Turning now to the ballot access claim, the Republican Party claims that the First Amendment "guarantees a candidate access to the ballot." *See Pls.' Mem. of Law, p. 15; Dkt. 23.*  This statement is too broad; the Supreme Court, on numerous occasions, has affirmed the principle that "[s]tates may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *See, e.g., Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358 (1997).  The Court has noted that although voting is a fundamental right, "[i]t does not follow . . . that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute."  *Burdick,* 504 U.S. at 433.  Thus, to cite one example, the Court has held that "[t]he

21

State has the undoubted right to require candidates to make a preliminary

showing of substantial support in order to qualify for a place on the ballot,

because it is both wasteful and confusing to encumber the ballot with the

names of frivolous candidates." *Anderson,* 460 U.S. at 788, n. 9 (citations

omitted).

But this discussion is ultimately beside the point. The precise scope

of a candidate's right of access to the ballot is irrelevant here, for the

simple reason that candidate Price was not denied access to the ballot.

Price's supporters were free to vote for him at the polls; his name was on

the ballot there. As discussed above, absent special circumstances not

present here, there is no right to vote by absentee ballot. By extension, a

candidate has no fundamental right to have his name on an absentee

ballot.[11] Thus, there is no burden on Price's right to ballot access.

### c.    The Right to Associate Claim–Nature of the Burden

The Republican Party also claims that Election Law § 7-122 violates

its right to associate with its members. It argues that "[t]he Party has a

right to maximize the participation of its members in a primary election."

---

[11]At least when the position he is running for is not covered by the absentee ballot. The analysis might be different if the position was covered by the absentee ballot, but the candidate was denied access to the absentee ballot. The court expresses no view on this hypothetical state of facts.

*See Pls.' Mem. of Law, p. 18; Dkt. 23.*  But the Republican Party has not pointed to any case law suggesting that a law limiting absentee balloting imposes an impermissible restriction on a political party's right to associate with its members.  Indeed, in *Unity Party v. Wallace,* 707 F.2d 59, 62 (2d Cir. 1983), the Second Circuit held that a political party's right to associate was not violated even where its candidate was completely barred from the ballot.  The Circuit noted that appellants were "not totally excluded from voting or prevented from associating with the political group of their choice" because "they could have cast a write-in ballot for [the party's] candidate." *Id.*  Thus, the Circuit concluded that "any encumbrance on appellants' rights to vote and politically associate is at best *de minimis.*"  *Id.*  In this case, where the Republican Party's candidate appears on the regular ballot, any restriction on the right to associate is less than that in *Unity Party.*  As stated above, Republican Party members who wished to "associate" with the party were free to do so at the polls.  Thus, any burden on the right to associate is *de minimis.*

## 4.    The Level of Scrutiny to be Applied

Having determined that Election Law § 7-122 imposes at best a limited burden on First and Fourteenth Amendment rights, the next step is to determine the level of scrutiny to be applied.

Courts have generally been reluctant to establish bright line rules regarding the level of scrutiny to which laws regulating elections are subjected.  The Second Circuit has noted that policing the distinction between legitimate regulations and improper restrictions "does not lend itself to a bright line or 'litmus-paper test.'"  *Lerman,* 232 F.3d at 146 (citation omitted).  Thus, as noted above, courts apply a sliding scale where laws that impose severe restrictions on the fundamental right to vote are subjected to exacting scrutiny, while laws that impose lesser restrictions are subjected to a lesser degree of scrutiny.

As with any case that defies the application of bright-line rules, in this case it is easier to determine what level of scrutiny *does not* apply than it is to articulate the level of scrutiny that does apply.  It is clear, for starters, that strict scrutiny does not apply to the court's review of Election Law § 7-122.  Because the law imposes at the most a modest burden on the fundamental right to vote, the State Board need not establish that the law is necessary to further a compelling government interest.  *See Burdick,* 504

24

U.S. at 439 (Where "state's ban on write-in voting imposes only a limited burden on voters' rights . . . the state need not establish a compelling interest to tip the constitutional scales in its direction.").

At the same time, it would be inappropriate to apply a purely deferential review to Election Law § 7-122, because the law arguably imposes *some* burden on voting rights.

However, where, as here, the burden on voting rights is *de minimis,* the standard of review the court applies is far closer to a purely deferential review than it is to strict scrutiny.  The Second Circuit's opinion in *Unity Party v. Wallace,* 707 F.2d 59 (2d Cir. 1983), is instructive.  In that case, the Unity Party's candidate for United States Senate complied with all requirements for gaining access to the ballot, save one–he accepted the Party's nomination for Senate in a letter, rather than submitting "a certificate signed and acknowledged by him," as required by New York Election Law.  *Id.* at 60-61.  The Unity Party sought an injunction ordering that its candidate's name be included on the ballot, arguing that the statute requiring a signed acknowledgment impermissibly burdened the Party members' First and Fourteenth Amendment rights of voting, political association, and equal protection.  *Id.* at 61.  In determining the level of

scrutiny to apply to the challenged law, the Second Circuit began by noting that the Unity Party members were not "totally excluded from voting or prevented from associating with the political group of their choice," because they could have cast a write-in ballot for their candidate.  *Id.* at 62.  Thus, given the availability of alternatives, the burden on the Unity Party members' fundamental rights to politically associate and to vote was "at best *de minimis,*" and New York could "justify the restriction by advancing a rational basis for it."  *Id.* at 62.

In this case, as in *Unity Party*, the New York law at issue does not serve as a total bar to voting.  The plaintiff-voters McMahon and Thornton were free to vote at the polls.  This alternative may have been inconvenient or difficult for them, but certainly no more difficult than the burden imposed on the plaintiffs in *Unity Party,* who could only vote for their candidate by write-in ballot.  Thus, in this case, by analogy to *Unity Party,* the court applies a rational basis standard to its review of an election law that imposes only a *de minimis* burden on the right to vote.

### 5.    The Government's Regulatory Interest

As the Republican Party acknowledges, under a rational basis review, a law will be upheld so long as it advances a legitimate government

interest.  *See Heller v. Doe,* 509 U.S. 312, 319-320 (1993).  Additionally,

under rational basis review, courts are compelled to accept a legislative

scheme "even when there is an imperfect fit between means and ends."  *Id.*

at 321.  If there are "plausible reasons" for the challenged legislative action,

a court's inquiry is at an end.  *F.C.C. v. Beach Commc'ns, Inc.,* 508 U.S.

307, 313-14 (1993).  Moreover, as the State Board notes, the legitimate

objective which the court finds to support a classification need not have

been articulated by the legislature in the statute or the legislative history.

*See Heller,* 509 U.S. at 320.

    According to the State Board, "[t]he limitation of the distribution of

absentee ballots for elections for political party office is based upon the

statutory need to have finality in elections for party office on primary

election day."  *See Defs.' Mem. of Law, p. 5; Dkt. 24.*  The State Board's

argument is based on the interaction of several different sections of the

New York Election Law.

    First, under New York Election Law, in order to be counted, absentee

votes must either be:

- hand delivered to the board of elections before the close of the
  polls on election day; or

- if they are mailed, be postmarked by the day before election day (at the latest) and received by the board of elections within seven days following election day.

N.Y. ELEC. LAW § 8-412(1).

Thus, if absentee voting were permitted for the position of Committeeman, it is conceivable that all eligible votes for a given Committeeman position would not be received until seven days after the primary election.

For most elected positions, the seven day delay occasioned by the absentee voting statute is immaterial–particularly at the primary election stage–because the elected official will not take office immediately anyway. However, under New York Election Law, the term of a Committeeman ends on primary election day.  N.Y. ELEC. LAW § 2-106(4).[12]  Thus, if absentee balloting were allowed for Committeeman positions, there could conceivably be a seven day window during which the terms of the previous Committeemen had ended, but the results of the election for new Committeemen still hung in the balance.

––––––––––––––––––––

[12]This section provides that members of state and county committees "shall hold office until the next election at which members of the committee are elected."  N.Y. ELEC. LAW § 2-106(4).  It is not at all clear from the language "until the next election" whether a Committeeman's term begins on election day, or on the day after election day.  The Republican Party asserts that the term begins the day after election day.  *See Kermani Decl.  ¶ 4; Dkt. 22.*

28

Although a period of uncertainty with regard to the proper occupant of an elected office is never a good thing, it is particularly inconvenient for the position of Committeeman to be vacant during the seven days immediately following the primary election.  This is because the party committee must perform certain key functions in the days immediately following the primary election.

First, every county committee must, within twenty days of its election, meet and organize by electing a chairman, a secretary, a treasurer, and such other officers as it may by its rules require.  N.Y. ELEC. LAW § 2-112(1).  A county committee cannot act until it has organized.  *See Steward v. Fossella,* 665 N.Y.S. 2d 819, 821-822 (N.Y. Sup. Ct. 1997).

Second, and more importantly, a county committee, in some circumstances, will be called upon to nominate a party candidate for a vacant local public office.  Typically, of course, a political party nominates its candidates for vacant offices at a primary election–the very same primary election at which Committeemen are elected.  However, in certain circumstances, a public office will become vacant unexpectedly during the weeks leading up to the primary.[13]  If this unexpected vacancy occurs too

---

[13]For instance, the current occupant of a public office may die or resign.

late in the game, a political party cannot nominate its candidate for the

position in accordance with normal procedures–i.e., a primary election.

Instead, it becomes the duty of the county committee to select the political

party's candidate for that newly-vacant position.  *See* N.Y. ELEC. LAW § 6-

116.  In making its nomination, the county committee must comply with the

following key deadlines:

- If the vacancy occurs more than seven days before the primary election (but still too late to qualify for placement on the ballot at the primary election[14]), then the county committee must make its nomination to fill that position *not later than seven days after the fall primary election*.  N.Y. ELEC. LAW § 6-158(6).
- If the vacancy occurs within seven days of the primary election (or at any time after the primary election), then the county committee must make its nomination *within fourteen days after the creation of the vacancy*.  N.Y. ELEC. LAW § 6-158(6).[15]

In light of these deadlines, the State Board asserts that the

prohibition on absentee balloting for Committeemen contained in Election

Law § 7-122 is necessary in order to ensure that the newly-elected

---

[14]The exact date beyond which a vacancy cannot be included on the primary ballot is not significant to the analysis–suffice it to say that in order for a position to be voted on at the primary, the position must become vacant a certain number of days prior to the primary.

[15]New York Election Law § 6-158(6) provides, in relevant part:

A certificate of a party nomination made other than at the primary election for an office to be filled at the time of a general election shall be filed not later than seven days after the fall primary election, except that a certificate of nomination for an office which becomes vacant after the seventh day preceding such primary election shall be filed not later than fourteen days after the creation of such vacancy . . .

committee is fully constituted in time for it to perform certain time-sensitive functions in the days immediately following the primary election.

The Republican Party takes issue with the justifications offered by the State Board.  The court considers each of the Republican Party's arguments in turn.

First, the Republican Party points out that a new committee member "is not considered elected until certified by the Board of Elections."  *See Pls.' Mem. of Law, p. 12; Dkt. 23* (citing *Settineri v. DiCarlo,* 605 N.Y.S.2d 95, 97 (N.Y. App. Div. 1993) (Balletta, J., dissenting) *reversed for the reasons stated in the dissent* by 624 N.E.2d 683 (N.Y. 1993)).[16] Certification does not happen instantaneously.  Indeed, the Election Law provides that the board of elections can take up to nine days after a primary election to canvass the vote and certify a winner.  N.Y. ELEC. LAW § 9-200(1).  Thus, the Republican Party argues, the seven day delay in waiting for absentee ballots does not delay a certification process that can take up to nine days.

---

[16]This citation warrants a brief explanation.  In *Settineri v. DiCarlo,* the New York Court of Appeals reversed the decision of the Appellate Division "for reasons stated in the dissenting" opinion below.

The Republican Party has, without a doubt, identified an odd inconsistency in the New York Election Law.  Ideally, the Election Law would be drafted in such a way that there would be no possibility of a gap between the end of the term of the old Committeemen and the beginning of the term of the new Committeemen.  The legislature probably sought to ensure this result when it decided to preclude absentee balloting for Committeemen.  Obviously, to fully achieve its goal, the legislature should have taken additional steps, such as, for instance, shortening the time frame for certifying the results of Committeemen elections.  However, it is not the role of the courts to correct every legislative oversight.  Rational basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."  *Heller,* 509 U.S. at 319 (citations omitted).

Moreover, the legislative action at issue in this case, though clumsy, is not without justification.  Election Law § 9-200(1) gives the board of elections up to nine days to certify the election results.  Nine days, in other words, is the outer limit.  There is nothing to preclude the board of elections from certifying the election results immediately, in which case Committeemen would take office immediately following the election.  By contrast, if absentee voting were permitted, it would be more difficult for

election results to be certified any earlier than seven days after the election.  So long as any issued absentee ballots remained outstanding during that seven day period following the election, the board of elections could not certify the results.  This would be true even if the outstanding absentee ballots were so small in number as to be non-outcome-determinative.  This is because the canvassing and certification process entails the creation of "tabulated statements . . . of the number of votes cast for all the candidates for . . . election to each party position, and the number of votes cast for each such candidate."  N.Y. ELEC. LAW § 9-200(1).  Quite clearly, the number of votes cast for each candidate cannot be determined until all absentee ballots are accounted for (or until the deadline for acceptance of absentee ballots has passed).

The Republican Party also argues that there is no real danger that a newly-elected county committee will be faced with a seven day deadline for nominating a candidate for a recently-vacated public office.  The Republican Party notes that "[a] political party that is concerned about not having enough time to nominate a candidate to fill a vacancy after the primary election can simply nominate a candidate before the election."  *See Pls.' Mem. of Law, pp. 12-13; Dkt. 23.*  In fact, however, the Republican

33

Party's argument in this regard is based on a misunderstanding of the applicable law.  Section 6-116 of the Election Law explicitly provides that a party nomination of a candidate to fill an unexpected vacancy in a public office "shall be made, *after the day of the primary election.*"  N.Y. ELEC. LAW § 6-116 (emphasis added).  Thus, even if the county committee becomes aware of the vacancy prior to the primary election, it cannot act to nominate a candidate until after the primary election; at which point, of course, it will have to act within the seven- or fourteen- day deadlines described above.

The Republican Party points out that in the event that a newly-elected committee does not have the opportunity to meet and nominate a candidate to fill a vacancy in a public office within seven (or fourteen) days of the primary election, as required by law, the political party is not without recourse.  The New York Court of Appeals has crafted a judicial solution to the problem.  In *Settineri v. DiCarlo,* 624 N.E.2d 683 (N.Y. 1993), discussed above, the Committeemen were not certified by the board of elections until eight days after the primary election, one day after the deadline to nominate a candidate for a vacant Senate position.  Since it was therefore effectively impossible for the newly elected committee to file a certificate of nomination for the vacant Senate seat, the Court of Appeals

permitted the outgoing committee chairperson to act for the party and nominate a candidate.

However, the need for quick and expedient election results in Committeemen elections is not obviated by the fact that there is a judicially-crafted "emergency" exception to the general rule that a newly elected committee must nominate candidates for vacant offices within seven days of the primary election. Sections 6-116 and 6-158(6) of the Election Law together reflect the legislative determination that party nominations should be made by the newly elected committee, not the outgoing committee. The fact that in certain emergency circumstances the outgoing committee must take on this role does not change the fact that it is the preference of the legislature that the new committee should act. The new committee can only fulfill its legislatively-delegated role if it is certified and organized within seven days of the primary election. This would be more difficult if absentee votes were permitted.

The Republican Party also argues that Election Law § 7-122 is, in essence, unnecessary, because it is only in very rare circumstances that the time pressures feared by the State Board will actually come into play. The Republican Party notes that during a given election cycle, only three or

four Committeemen seats are likely to be contested. *See Kermani Decl. at*
*¶ 15; Dkt. 22.* Additionally, the Republican Party asserts that it is very
unusual for vacancies in public office to occur in even number years (*i.e.*,
the years in which Committeemen are elected) because local offices in
New York are voted on in odd years. *Id. at ¶ 20.* However, the Republican
Party has pointed to no case law suggesting that the legislature acts
outside the bounds of its authority–or even outside the bounds of good
sense–when it enacts legislation targeted at an infrequently-occurring
problem. Moreover, *Settineri v. DiCarlo*, 624 N.E.2d 683 (N.Y. 1993), a
case cited by the Republican Party, indicates that the situation
contemplated by the law is not wholly implausible.

Finally, the Republican Party argues that Election Law § 7-122 is not
narrowly tailored to achieve its intended result. Having determined that
strict scrutiny does not apply, the court need not address this argument.

In summary, New York Election Law § 7-122 passes constitutional
muster under a rational basis review. The State Board has articulated a
legitimate government interest behind the law–the need for immediate
finality in county committee elections–and the law advances this interest.
To achieve its ends, the legislature might have adopted a more elegant

statutory scheme.  However, that is not the concern of this court.  Under rational basis review, a statute "may not be condemned simply because it imperfectly effectuates the State's goals."  *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 51 (1973).  It is enough that the legislative goal is legitimate, and New York Election Law § 7-122 serves to advance it.

## VI.  Conclusion

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that the Republican Party's motion for summary judgment is DENIED, and the State Board's cross-motion to dismiss is GRANTED; and it is further

**ORDERED** that the TRO dated September 11, 2006, is dissolved; and it is further

**ORDERED** that the complaint is dismissed; and it is further

**ORDERED** that the Clerk of the Court enter judgment and close the case.

**IT IS SO ORDERED.**

October 22, 2007
Albany, New York

Gary L. Sharpe
U.S. District Judge

37